Filed 10/16/20  P. v. Jones CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073288 |
| v. | (Super.Ct.No. BAF1700793) |
| DONNIE RAY JONES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas D. Glasser, Judge.  (Retired Judge of the San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant and appellant, Donnie Ray Jones, was convicted by a Riverside County Superior Court jury of one count of attempted murder (Pen. Code,[1] §§ 664, 187, count 1) and one count of assault with a deadly weapon (§ 245, subd. (a)(1), count 2), arising out of the July 3, 2017, stabbing of John Doe. The jury also found true special allegations that defendant acted willfully with deliberation and premeditation in the commission of count 1 (§ 189); personally inflicted great bodily injury in the commission of both counts 1 and 2 (§ 12022.7, subd. (a)); and personally used a deadly weapon in the commission of counts 1 and 2 (§ 12022, subd. (b)). In a bifurcated proceeding, the trial court found true allegations that defendant had suffered two prior convictions, which qualified as serious felony priors and strike priors. (§ 667, subds. (a), (c), (e)(2)(A).)

Defendant was sentenced to a total of 25 years to life, plus an additional 14 years, representing an indeterminate term of 25 years to life for the attempted murder conviction; two consecutive five-year terms for the serious felony prior enhancements; a consecutive three-year term for the great bodily injury enhancement; and a consecutive one-year term for the personal use of a deadly weapon enhancement.[2] Additionally, the trial court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), and $654.58 in various court fees and assessments.

---

[1] Undesignated statutory references are to the Penal Code.

[2] The trial court also sentenced defendant on count 2 but stayed the execution of the sentence.

On appeal, defendant contends: (1) there was insufficient evidence to support his conviction for attempted murder; (2) the trial court committed prejudicial error in admitting the preliminary hearing testimony of an unavailable witness; and (3) his constitutional rights were violated when the trial court imposed various fines and fees without conducting a hearing on his ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We conclude sufficient evidence in the record supports defendant's conviction; find no error in the trial court's admission of preliminary hearing testimony; deem defendant's challenge to the imposition of a $10,000 restitution fine forfeited for failure to preserve the issue below; conclude defendant cannot establish prejudice with respect to the imposition of the remaining fines and fees; and, therefore, affirm the judgment.

## II. FACTS AND PROCDURAL HISTORY

A. *Facts and Charges*

On the morning of July 3, 2017, officers with the Hemet Police Department discovered John Doe in a motel room after responding to a report of a stabbing. John Doe was discovered with a stab wound across his abdomen. Officers described the wound as a large gash with John Doe's intestines and organs protruding from the wound.

Defendant was arrested and charged in an information with one count of attempted murder (§§ 664, 187, count 1) and one count of assault with a deadly weapon (§ 245, subd. (a)(1), count 2) arising out of the stabbing of John Doe. The information also alleged defendant acted willfully, deliberately, and with premeditation in the commission of count 1 (§ 189); personally inflicted great bodily injury in the commission of both

3

count 1 and count 2 (§ 12022.7, subd. (a)); and personally used a deadly weapon in the commission of both count 1 and count 2 (§ 12022, subd. (b)). Finally, the information alleged defendant had suffered two prior convictions, each of which qualified as a strike prior (§ 667, subds. (c), (e)(2)(A)) and serious felony prior (§ 667, subd. (a)).

B. *Relevant Evidence at Trial*

    1. <u>Testimony of Responding Police Officers</u>

An officer with the Hemet Police Department testified that in the early morning hours of July 3, 2017, he was dispatched to a motel following a report of a possible stabbing. When he arrived at the scene, he was directed to a specific motel room where he found John Doe laying on the bed without his shirt on. John Doe was moaning; had blood on his face, hands, and right side; and had portions of his intestines outside of his stomach. John Doe was unable to communicate with the officer; paramedics arrived shortly thereafter; and John Doe was transported to the hospital.

A second officer testified that he was also called to respond on July 3, 2017. The second officer observed John Doe in the motel room with a stab wound from one side of his stomach to the other, approximately nine inches long, with organs protruding from the wound. The second officer performed a security sweep of the area and viewed the motel's security surveillance video. From these videos, he was able to obtain descriptions of individuals who had been inside the motel room where John Doe was found, as well as the description of a suspect vehicle. On cross-examination, the second officer testified that the particular motel was a location known to law enforcement as a place where drug activity occurred.

2. Testimony of M.M.

The transcript of M.M.'s preliminary testimony was read to the jury.[3] M.M. testified that he was living on the streets and had known defendant from interactions on the streets for approximately one or two months prior to the incident. In the early morning of July 3, 2017, he accompanied defendant to a motel along with two women. Defendant had expressed a desire to confront a man staying at the motel who was trying to "get at his lady." They drove to the motel in a red car owned by one of the women.

When they arrived at the motel, defendant, M.M., and one of the women got out of the car and went straight to one of the rooms. M.M. knocked on the door to the room and a man whom M.M. did not know answered it. M.M. estimated that about five or six other people were also inside the room, including a man lying on the bed. M.M. watched as defendant walked to the man lying on the bed; put his hand over the man's mouth; and "gutted" the man with a knife. M.M. was surprised by defendant's actions, pulled defendant away from the man, took defendant back to the car they arrived in, and left with defendant and defendant's girlfriend.

On cross-examination, M.M. admitted he was a drug user and knew several of the people in the motel room to be drug users. On prior occasions, he had observed John Doe and defendant hanging out with each other, but he did not know of any issues between them. He was surprised by what he saw because, on the way to the motel, there

---

[3] M.M. could not be located to testify at the time of trial. Accordingly, the trial court granted a motion to permit the prosecutor to have M.M.'s preliminary hearing testimony read to the jury over defendant's objection.

had been no mention of any intent to assault John Doe, and he had not seen defendant carrying a knife. Despite being shocked at what he saw, M.M. did not report the incident to police. M.M. further admitted that he had previously been convicted of burglary and giving false information to a police officer.

### 3. Testimony of C.W.

C.W. testified that he had never met defendant, but he had known John Doe for approximately a month or two prior to July 2017. He had spent the evening of July 2, 2017, and the morning of July 3 with John Doe in a motel room. He recalled two other women in the room with them during this time, as well as another man, J.S., who entered the room briefly at some time.

At around 6:00 a.m. on July 3, 2017, John Doe was sleeping in the bed of their shared motel room, while C.W. was awake and talking with the two women. One of the women went to answer a knock at the door, and C.W. saw M.M. and another man he did not recognize walk in. The man he did not recognize walked over to the bed and started punching John Doe. John Doe did not appear to wake up, fight back, or have any weapons. C.W. "vaguely remember[ed]" defendant pulling a knife out and stabbing John Doe with it, but he did not recall seeing what defendant did with the knife afterward. C.W. did not recall seeing what happened after the stabbing, as he and the two women, previously in the room, immediately left and went to a nearby doughnut shop. After getting both women safely to the doughnut shop, C.W. called the police.

C.W. did not recall whether he identified defendant during an earlier interview with police; did not recognize defendant at the time of the trial; and stated he could not

6

recall sufficiently to provide a description of the man who stabbed John Doe. C.W. admitted he had been previously convicted of theft and had been using methamphetamine on the date of the incident.

On cross-examination, C.W. admitted that everyone in the motel room that night had been using methamphetamines, heroin, weed, or alcohol. He stated he was not "necessarily" testifying in court voluntarily, as he had been picked up along with his girlfriend by police the previous day and told he needed to appear in court to testify. C.W. further admitted that he had been carrying multiple knives with him the night of the incident.

### 4. Testimony of L.L.

L.L. testified that she spent the evening of July 2, 2017, and the morning of July 3 with John Doe, C.W., one other woman, and one other man in a motel room. She recalled that in the early morning of July 3, John Doe was sleeping in the bed of the motel room, while she and the others were socializing in the bathroom area of the room. At around 5:45 a.m., she answered the door to the motel room, saw 10 to 12 African-American people standing outside, and was pushed aside as some of them attempted to enter the room.

L.L. recalled that "they all" surrounded the bed where John Doe was sleeping. One of them pulled John Doe up; screamed, "I thought I told you not to 'F' with my bitch"; took out a knife; and stabbed John Doe. At that point, C.W. pushed L.L. into the bathroom and told her not to come out. After some period of time, C.W. came to get her, told her not to look at anything, and told her they had to get their stuff and leave. On the

7

way out, she looked over to the bed and recalled seeing John Doe with his guts hanging out of him.

L.L. could not identify defendant in court at the time of her testimony and could not recall many specifics to describe the man she saw stabbing John Doe. She admitted she was on heroin and methamphetamines at the time of the incident and that she had multiple prior convictions for petty theft, identity theft, and other misdemeanor convictions. L.L. also admitted that she previously denied seeing anyone get stabbed when she was initially interviewed by the police, but stated that she probably said that because, "when you say anything on the street, you're going to get—something is going to happen to you."

5. Testimony of J.S.

J.S. testified he had known John Doe for approximately two weeks prior to July 3, 2017, and also knew defendant. In the morning of July 3, J.S. was hanging out with John Doe in a motel room with a few other people. He recalled everyone in the motel room was "getting high," and John Doe was lying on the bed. At some point, someone answered the door, and defendant walked into the room. J.S. could not remember who answered the door or how many people may have entered the room with defendant. He could not recall what he told police investigators at the time of the incident.

J.S. recalled that as he was leaving the motel room, he observed John Doe and believed John Doe looked bloody, as if he had been in a fight. However, J.S. stated he could not recall looking at anything other than John Doe's face at the time. On cross-

8

examination, he admitted having prior convictions for residential burglary and credit card fraud.

J.S.'s testimony was deemed inconsistent with his prior statements to police investigators and, as a result, a recorded interview was played to the jury. In the recorded interview, J.S. reported that he was the individual who answered the door to the motel room; that three people entered the room when he opened the door; and that the three individuals were defendant, M.M., and a woman. Upon entering the room, defendant approached John Doe, made a comment about John Doe talking to defendant's girlfriend, and began punching John Doe. Later in the interview, J.S. stated he saw defendant grab a white-handled knife and put the knife to John Doe's throat.

6. Testimony of Police Investigators

An investigator with the Hemet Police Department testified that on the morning of July 3, 2017, he was assigned to assist with an investigation of a stabbing that occurred in a motel. The investigator had previously undergone training and education in recognizing blood patterns, as well as conducted over a dozen investigations that involved analyzing blood patterns on surfaces. The investigator offered the opinion that the blood patterns on the wall of the motel room would be consistent with a knife, with a significant amount of blood on it, moving rapidly in an upward direction. Investigators searched the motel room for weapons but did not locate any.

A second investigator testified that he was also called to assist with investigating a stabbing on July 3, 2017. He reviewed surveillance video from the motel, identified descriptions of potential witnesses, and subsequently sought to interview the various

9

persons identified. During his interview with C.W., C.W. identified defendant as the stabber in a photo lineup.

7. Defendant's Testimony

Defendant testified in his own defense and explained that he was a longtime friend of J.S.; met John Doe sometime in 2016; and met M.M. about eight months prior to the July 3, 2017 incident. He considered John Doe a friend and would socialize with John Doe on the occasions John Doe came to Hemet. However, defendant admitted that prior to July 3, he was angry with John Doe because he believed John Doe had wronged him on multiple occasions.[4]

On July 2, 2017, defendant accompanied John Doe to pick up their mutual friend, J.S. When they arrived at J.S.'s home, John Doe drove off unexpectedly, leaving defendant without a ride home. After waiting several hours, defendant paid someone else to drive him home. When he returned home, defendant's girlfriend reported that John Doe had visited in defendant's absence and attempted to assault her.

Defendant testified that his girlfriend did not want to get the police involved, so defendant ultimately decided to go to John Doe's motel room to talk. He emphasized that his intent was simply to talk with John Doe and not to kill John Doe. However, defendant admitted that he was angry and hurt by what John Doe had done; he knew it

---

[4] These incidents included John Doe: (1) disclosing to others that defendant had a prior rape conviction; (2) spreading rumors that defendant was a child molester; (3) taking out the taillights and changing the tags on defendant's car, causing defendant to get pulled over; (4) spreading rumors that defendant's girlfriend had left him; and (5) taking defendant's money.

10

was possible the two would get into a fight; and he had no intention of walking away from a physical confrontation with John Doe. Defendant also admitted he subsequently told investigators that fighting was how he worked through frustration; that he wanted to beat John Doe; and that he wanted to knock John Doe unconscious. In his testimony, defendant sought to clarify that when making these statements to investigators, he was simply describing his feelings and not an actual intent to act.

When defendant arrived at John Doe's motel room, defendant saw John Doe lying on the bed next to a speed pipe with smoke coming out of his mouth. John Doe looked at defendant with a dismissive look, which caused defendant to become "full of rage." Defendant immediately went to John Doe, grabbed him, and began yelling at him about attempting to "rape" defendant's girlfriend. Defendant claimed that in response, John Doe sliced defendant's hand with a knife. Defendant grabbed the knife from John Doe, "poked" John Doe with the knife in the abdomen, dropped the knife, and continued to punch John Doe in the face. Defendant stated he continued to hit John Doe because he was concerned John Doe might have a gun somewhere in the motel room. At some point, defendant's girlfriend and M.M. grabbed defendant and they all left.

C. *Verdict and Sentencing*

The jury found defendant guilty of both premeditated attempted murder (§§ 664, 187, count 1) and assault with a deadly weapon (§ 245, subd. (a)(1), count 2). The jury also found true the allegations that defendant acted willfully and with deliberation and premeditation in the commission of count 1 (§ 189); personally inflicted great bodily injury in the commission of both count 1 and count 2 (§ 12022.7, subd. (a)); and

11

personally used a deadly weapon in the commission of count 1 and count 2 (§ 12022, subd. (b)).  In a bifurcated proceeding, the trial court found true the allegations that defendant had suffered two prior convictions that would qualify as serious felony priors and strike priors.  (§ 667, subds. (a), (c), (e)(2)(A).)

The trial court declined a request to strike or dismiss defendant's serious felony priors and strike priors.  Defendant was sentenced to a total of 25 years to life, plus an additional 14 years, representing an indeterminate term of 25 years to life for the attempted murder conviction; two consecutive five-year terms for the serious felony prior enhancements; a consecutive three-year term for the great bodily injury enhancement; and a consecutive one-year term for the personal use of a deadly weapon enhancement.  Defendant was also sentenced to 25 years to life, plus 13 years on count 2,[5] but the trial court stayed execution of the sentence.

### III.  DISCUSSION

A.  *Sufficient Evidence Supports Defendant's Conviction for Attempted Murder*

Defendant contends that insufficient evidence supports his conviction for attempted murder.  Specifically, he argues that there was insufficient evidence to show he harbored an intent to kill John Doe and insufficient evidence to support the special finding that his actions were premeditated or deliberate.  We disagree.

---

[5] On count 2, the trial court sentenced defendant to an indeterminate 25-year-to-life term for the underlying conviction, two consecutive five-year terms for the serious felony prior enhancements, and a consecutive three-year term for the great bodily injury enhancement.

12

1.  <u>General Legal Principles and Standard of Review</u>

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citation.] Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Perez* (2010) 50 Cal.4th 222, 229.)

" ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)  "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction." ' " (*Id.* at p. 508.)

13

As we explain *post*, there is more than sufficient evidence in the record from which the jury could reasonably infer that defendant had the specific intent to kill and acted with deliberation and premeditation in attempting to do so.

2. Substantial Evidence in the Record Supports the Jury's Conclusion Defendant Intended to Kill

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Here, multiple witnesses testified, and defendant himself admitted, that defendant stabbed John Doe with a knife. While the description of the stabbing varied from witness to witness, M.M. described defendant's act as a "gutt[ing]"; both L.L. and two responding officers described John Doe's knife wound as so severe that John Doe's intestines were hanging out of him; and at least one of the officers described the wound as being nine inches in length. Further, an investigator testified that the blood spatter along the wall of the motel room would be consistent with a knife moving rapidly in an upward direction. Thus, evidence regarding the manner in which defendant stabbed John Doe, as well as the extent of the resulting injury, suggests a heightened level of violence beyond a simple unintentional stabbing during a confrontation. In addition to this violent stabbing, the evidence also established that defendant punched John Doe in the face

14

multiple times while he was sleeping. This evidence supports a reasonable inference that defendant had the requisite intent to kill; and we, therefore, decline to reverse defendant's conviction on this ground.

　　　3.　Substantial Evidence in the Record Supports the Jury's Conclusion Defendant Acted Willfully with Deliberation and Premeditation

　　　"[T]he crime of attempted murder is not divided into degrees. [Citation.] [Instead], [t]he prosecution may seek a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for purposes of sentence enhancement." (*People v. Smith*, *supra*, 37 Cal.4th at p. 740.) "In the context of first-degree murder ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636.) However, " '[t]he process of premeditation and deliberation does not require any extended period time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " (*Ibid.*) Nonexclusive factors relevant to premeditation and deliberation include evidence of planning activity, motive, and manner of killing. (*Ibid*.)

　　　Here, sufficient evidence allows the jury to infer that defendant's act of stabbing John Doe was deliberate and premeditated. First, there was substantial evidence of motive. M.M. testified that defendant expressed the desire to go to the motel to confront John Doe because John Doe attempted to "get at" defendant's girlfriend; L.L. testified

15

that during the confrontation, defendant yelled at John Doe regarding John Doe's interactions with defendant's girlfriend; and defendant himself testified that he went to the motel to confront John Doe because defendant's girlfriend had accused John Doe of attempting to assault her.

Second, there was evidence in the record from which the jury could infer that defendant engaged in planning activity. M.M. testified that defendant walked in and immediately stabbed John Doe, and C.W. vaguely remembered seeing defendant pull the knife out and stab John Doe. C.W. further testified that John Doe had no weapons, and investigating officers did not recover a knife in the motel room. Further, defendant himself admitted to investigators that he was aware of the possibility of a fight with John Doe even prior to arriving at the motel. If believed, the jury could reasonably infer from this evidence that defendant entertained the possibility of physically attacking John Doe in advance of the confrontation and brought the knife with him, suggesting some level of planning.

Finally, the manner of the stabbing suggests the attempted murder "was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed.' " (*People v. Anderson* (1968) 70 Cal.2d 15, 26.) M.M., C.W., and L.L. all testified that defendant approached John Doe and initiated physical violence against John Doe almost immediately upon entering the motel room and without an exchange of any words. Defendant walked straight over to John Doe and immediately stabbed him so violently and extensively as to cause his intestines and internal organs to be exposed.

16

Based upon the short amount of time and limited interaction between defendant and John Doe prior to the stabbing and the violent manner of the stabbing, the jury could reasonably infer that defendant had already formed an intent to stab John Doe even before entering the motel room. Thus, evidence regarding the manner in which the stabbing occurred supports the conclusion that defendant's acts were deliberate. Since substantial evidence in the record supports the three primary factors relevant to a finding of deliberation and premeditation, sufficient evidence supports the jury's true finding on this allegation.

4. Sufficient Evidence Supports the Jury's Rejection of a Heat of Passion Defense

Finally, defendant argues that there was insufficient evidence to negate a heat of passion defense. However, where the jury has returned a true finding that defendant acted willfully, deliberately, and with premeditation, and sufficient evidence supports that finding, that same evidence is necessarily sufficient to negate a claim that defendant acted in the heat of passion.

Where heat of passion is at issue based upon the state of the evidence, the prosecution has the burden of proving beyond a reasonable doubt that a defendant did not act in the heat of passion. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1242.) If the prosecution fails to carry this burden, then a defendant is guilty of attempted voluntary manslaughter. (*Ibid.*) However, a jury's finding that a defendant acted willfully, deliberately, and with premeditation "necessarily resolve[s] the factual question adversely" to the defendant because "[t]his state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion."

17

(*Id.* at p. 1246; see *People v. Wharton* (1991) 53 Cal.3d 522, 572 [First degree murder necessarily includes a finding of deliberate and premeditated killing, which is manifestly inconsistent with a heat of passion defense.].)

As we have already explained *ante*, sufficient evidence in the record supports the jury's finding that defendant's actions were willful, deliberate, and premeditated. Accordingly, that same evidence is necessarily sufficient to negate a heat of passion defense, and we find no merit in defendant's argument that the prosecution failed to negate this defense.

B. *Admission of Preliminary Hearing Testimony Was Not Erroneous*

Defendant also contends that the trial court erred in admitting the preliminary hearing testimony of M.M. pursuant to Evidence Code section 1291. We disagree.

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses." (*People v. Herrera* (2010) 49 Cal.4th 613, 620.) " 'Traditionally, there has been "an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . ." ' " (*Id*. at p. 621) This exception is codified in Evidence Code section 1291, which provides that a witness's former testimony, such as preliminary hearing testimony, is admissible where the declarant is unavailable as a witness; the party against whom the former testimony is offered was a party to the prior action or proceeding involving the former testimony; and the party had the right and

opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the current hearing. (*Herrera*, at p. 621.)

On appeal, defendant does not dispute that: M.M. was unavailable at the time of trial; the People made a diligent and good faith effort to secure M.M.'s availability at trial; defendant was a party to the action at the time of M.M.'s preliminary hearing testimony; or that he had a right and opportunity to cross-examine M.M. at the time of the preliminary hearing. Defendant's sole contention is that his interests and motives at the time of the preliminary hearing were not sufficiently similar to those at the time of trial. However, the preliminary hearing and trial involved the same parties, addressed the same set of criminal charges against defendant, and addressed the same set of events giving rise to those charges. The potential penalty defendant faced was the same at the time of the preliminary hearing and at the trial, and defendant's general objectives—to establish innocence, discredit the prosecution's case, or elicit evidence mitigating the charges brought against him—were identical in both proceedings.

Defendant's argument on appeal that he was unable to effectively cross-examine M.M. in support of a heat of passion defense at the time of the preliminary hearing is unpersuasive. At the time of his preliminary hearing, M.M. provided direct, inculpatory testimony that defendant had a potential motive to kill John Doe, defendant immediately resorted to violence against John Doe without any exchange of words, and that the manner in which defendant stabbed John Doe was a "gutting." Accordingly, defendant had every incentive at the time of the preliminary hearing to either discredit M.M.'s

testimony or elicit mitigating factors or circumstances surrounding these events on cross-examination.

The fact that defense counsel in retrospect would have preferred to direct additional questions to M.M. regarding a heat of passion defense does not dictate a different outcome. " '[A]s long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1173-1174. "[T]he admissibility of this evidence [does] not depend on whether defendant availed himself fully of that opportunity." (*People v. Zapien* (1993) 4 Cal.4th 929, 975; see *People v. Cudjo* (1993) 6 Cal.4th 585, 618.) Accordingly, we find no error in the trial court's admission of M.M.'s preliminary hearing testimony and decline to reverse defendant's conviction on this ground.

C. *Any Error for Failure To Conduct an Ability To Pay Hearing Prior to Assessment of Fines and Fees Does Not Warrant Reversal*

Finally, defendant argues the trial court was required to conduct an ability to pay hearing prior to imposing monetary fines and fees pursuant to *Dueñas*, *supra*, 30 Cal.App.5th at page 1160, and the matter must be remanded for the trial court to conduct such a hearing. Here, the trial court imposed a $10,000 restitution fine (§1202.4,

20

subd. (b)), and $654.58 in various court fees and assessments.[6]  We conclude that defendant has forfeited this claim by failing to preserve the issue below and further conclude that on this record, defendant has not established prejudice warranting remand.

The failure to conduct an ability to pay hearing with respect to fines and fees is considered error under *Dueñas*.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)  However, as the People correctly note, *Dueñas* was decided in January of 2019—months prior to defendant's sentencing hearing in July of 2019.  Accordingly, defendant could have specifically objected to the imposition of any fine or fee under *Dueñas* at the time of sentencing, and his failure to do so forfeits the issue on appeal.  (See *People v. Taylor* (2019) 43 Cal.App.5th 390, 399-400 (*Taylor*) [failure to object to restitution fine based upon inability to pay forfeits issue on appeal]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 [same].)

Additionally, we disagree with defendant's claim that his counsel's failure to request an inability to pay hearing constituted ineffective assistance of counsel requiring reversal.  To prevail on a claim of ineffective assistance of counsel, defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice.  [Citation.]  . . . [P]rejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "

---

[6]  Specifically, the trial court imposed $514.58 in administrative and booking fees (Gov. Code, § 29550); a $60 criminal conviction assessment (Gov. Code, § 70373); and an $80 court operation assessment fee (§ 1465.8, subd. (a)(1)).

(*People v. Bolin* (1998) 18 Cal.4th 297, 333.) Further, a reviewing court " ' " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " ' " (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

Here, while counsel did not specifically reference *Dueñas*, *supra*, 30 Cal.App.5th 1157, we note that defense counsel did bring the prospect of defendant's inability to pay to the trial court's attention at the time of sentencing. As this court recently explained in *Taylor*, even before *Dueñas*, the defendant's inability to pay was an express statutory factor for the trial court's consideration in setting any amount of restitution above the statutory minimum under section 1202.4. (*Taylor*, *supra*, 43 Cal.App.5th at p. 399) Despite defendant's claimed indigence, the trial court imposed a $10,000 restitution fine.[7] Accordingly, defendant has not met his burden to show a reasonable probability of a different outcome had defense counsel simply referenced *Dueñas* in arguing against the imposition of defendant's restitution fine.

With respect to the remaining fees of $654.58, we conclude that even in the absence of forfeiture and assuming error under *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant has not shown prejudice warranting reversal. Alleged error under *Dueñas* is not reversible per se but instead subject to a harmless error analysis. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1034-1035 (*Jones*).) Since an alleged error under *Dueñas* involves a violation of due process, we consider whether the error was harmless beyond a

---

[7] On appeal, defendant does not claim that the amount of the fine constituted an abuse of discretion in light of the statutory factors set forth in section 1202.4.

reasonable doubt. (*Jones*, at p. 1035; see *Chapman v. Cal.* (1967) 386 U.S. 18, 24.) "Because a no ability to pay hearing was held, it is not defendant's burden on appeal to establish his eligibility for relief. Nevertheless, we will find *Dueñas* error harmless if the record demonstrated he cannot make such a showing." (*Jones,* at p. 1035.)

Here, there is little evidence in the record regarding defendant's current assets or earning capacity. Nevertheless, "the trial court should not limit itself to considering only whether [a defendant] [has] the ability to pay at the time of the sentencing hearing. . . . [I]t is appropriate for the court to consider the wages that [a defendant] may earn in prison." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 96, review granted Nov. 13, 2019, S257844;*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Thus, in considering the prejudicial impact of any failure to conduct an ability to pay hearing, we cannot ignore the fact that defendant was sentenced to a very lengthy term of 25 years to life, plus an additional 14 years, in state prison. Even assuming defendant may only be capable of earning prison wages for some portion of this incarceration and assuming defendant's actual time in prison may be potentially reduced for an award of conduct credit, the suggestion he will be unable to earn and pay $654.58 over the course of such a lengthy sentence is untenable, and we conclude that any error under *Dueñas* was harmless.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

McKINSTER
Acting P. J.

RAPHAEL
J.